(No. 72097.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LENARD JOHNSON, Appellant.

*Opinion filed January 28, 1993.—Rehearing*
*denied March 29, 1993.*

McMORROW and NICKELS, JJ., took no part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Karen Alice Kloppe, Assistant Attorneys General, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Defendant pled guilty in the circuit court of Montgomery County to one count of murder, one count of home invasion, and two counts of aggravated criminal sexual assault. At the death penalty phase, he waived his right to a jury. The trial judge found him eligible for the death penalty, under the Criminal Code of 1961 (the Criminal Code), sections 9—1(b)(6) and (b)(7) (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(b)(6), (b)(7)). At the sentencing stage, the judge found three aggravating factors and no mitigating factors. Accordingly, he sentenced defendant to death. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(h).) The death sentence was stayed (134 Ill. 2d R. 609(a)) pending direct review by this court. (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603.) We now affirm the murder and sexual assault convictions and their corresponding sentences, including the death sentence. We vacate the conviction of home invasion and its corresponding sentence of 60 years' imprisonment.

## BACKGROUND FACTS

The following facts were presented by the State following defendant's plea of guilty and at the death penalty phase. On the evening and early morning of May 11-12, 1990, defendant baby-sat several children for his friend, James Emerson. Emerson returned home with

his wife at about 3:30 a.m., and drove defendant to his house. When Emerson arrived back at his own home his wife told him that one of the children had been molested. They took that child and their youngest child to the hospital, leaving their 11-year-old son, Donald Buske, and two minor female friends at home. They told the children to lock the door and wait for the police.

Shortly after they left for the hospital, defendant, armed with three knives he had brought from his house, returned and broke into Emerson's home. Defendant ordered the girls into the bathroom and told them to take off all their clothes except for their underwear, threatening death if they did not comply. He then woke Donald, chased him down a hall, and stabbed him twice. One of the wounds nearly decapitated Donald. The boy lost consciousness within 5 to 10 seconds, and bled to death within 30 seconds.

Defendant then returned to the bathroom and told the girls that he had killed Donald by slicing Donald's throat and that he would do the same to the girls if they did not obey him. He offered to drag Donald's body into the room if they did not believe what he had done. He then cut off one of the girls' underpants and raped and orally sodomized her. He told her that he would cut off her legs if she did not keep them spread. He attempted the same with the other girl, but apparently could not succeed. He then put his finger in the second girl's vagina. During this time, he asked each girl at least once if she wanted the other girl to live, and then said that he was going to kill them anyway.

Ray Trimble, a Litchfield police officer, arrived at the scene shortly afterwards, and through a window saw defendant holding a knife to a naked girl's throat. Defendant yelled that the police should back off or he would cut the girls. After making more threats and saying that he had already killed someone, he agreed to re-

lease the girls. He then attempted suicide, and the police entered the house. Defendant was taken to the hospital.

At the hospital, he was guarded by Deputy Sheriff Thomas Unser. Unser tried to advise defendant of his rights, to which defendant replied, "I gave up my rights when I killed Donald." Defendant was taken into custody, and ultimately pled guilty to murder, home invasion, and two counts of aggravated criminal sexual assault.

The trial judge found three aggravating factors: that the murder occurred during the course of a felony, that there was exceptionally brutal or heinous behavior against a child indicative of wanton cruelty, and that the murder was committed in a cold, calculated and premeditated manner. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(b)(6), (b)(7), (b)(10).) In mitigation, defendant offered the fact that he is legally blind, that he grew up in one of the worst neighborhoods of Chicago, that he had no significant history of criminal activity, that he was under extreme mental or emotional disturbance at the time of the murder, and that the murder was not premeditated. The trial judge found that there were no mitigating factors and sentenced defendant to death. After this direct appeal was filed, defendant made a motion to withdraw his guilty pleas, which was denied by the trial court.

## DEFENDANT'S PLEA OF GUILTY

Defendant contends that his motion to withdraw his guilty plea was wrongfully denied by the trial court. He urges this court to vacate his plea of guilty and remand for a new trial.

Whether to permit a plea of guilty to be withdrawn is within the sound discretion of the trial court. (134 Ill. 2d R. 604(d); *People v. Hillenbrand* (1988), 121 Ill. 2d 537, 545.) However, "[when] it appears that the plea of guilty was entered on a misapprehension of the facts or of the

law, or in consequence of misrepresentations by counsel *** or the case is one where there is doubt of the guilt of the accused, or where the accused has a defense worthy of consideration by a jury, or where the ends of justice will be better served by submitting the case to a jury, the court should permit the withdrawal of the plea of guilty and allow the accused to plead not guilty." *(People v. Morreale* (1952), 412 Ill. 528, 531-32.) As will be shown, none of these justifications is present in the instant case.

Defendant offers three reasons for his contention that he should have been allowed to withdraw his guilty plea: first, his confession was not voluntary; second, his plea was the result of misunderstanding his lawyer's advice; and third, he was not adequately aware of the consequences of his plea. We address these three arguments in turn.

Defendant suggests that his plea should be vacated because it was not made voluntarily, but rather out of fear for his safety. If this were true, the plea should be withdrawn under *Morreale,* as it would be a defense worthy of consideration.

Defendant states that he pled guilty because he felt that he would not receive a fair trial in Montgomery County and also because of racial intimidation- at the Montgomery County jail. He felt that he was being harassed by three white inmates because he was the only black inmate. His idea was that after his plea was entered he would get a new lawyer who would get the plea withdrawn and get a new trial in a different county.

However, there is nothing in the record to support defendant's claim of harassment except defendant's self-serving testimony. In fact, there were 38 blacks held in the Montgomery County jail while defendant was there, and the defendant was held in his own cell for the duration of his confinement and isolated from all the other

inmates. Neither defendant nor his attorney complained to jail authorities of any threats.

Further, defendant's plea of guilty was perfectly harmonious with all of his actions up until that time. This was not a man who had protested his innocence and then abruptly changed his mind. Rather, this is a man who was caught in the midst of his illegal actions and who has never denied his guilt. Except for this appeal, defendant has done nothing inconsistent with an intent to confess to his crimes. He has admitted his culpability at every stage, from arrest to conviction. He may now regret being so forthcoming. But regret in hindsight does not render a confession involuntary.

Defendant's second argument that his plea should have been withdrawn is that it was entered due to a misunderstanding of his lawyer's advice. Under *Morreale*, this would justify withdrawal of the plea. The alleged misunderstanding stemmed from defense counsel's explanation of what would happen following a plea of guilty. Defendant's lawyer told defendant that if he pled guilty there would be an automatic appeal to the Illinois Supreme Court, since it would be a capital case, and that his appeal would be handled by the State Appellate Defender. Defendant acknowledges in his brief that this is what was told to him, but nevertheless claims that he took this to mean that he would receive a new trial with new lawyers. Defendant cites *People v. Hale* (1980), 82 Ill. 2d 172, for the proposition that misunderstanding counsel's advice is grounds for vacating a plea of guilty. Since *Hale* said the opposite, defendant apparently wishes to distinguish that case.

*Hale* involved a man who pleaded guilty to armed robbery. His plea was entered after a full recitation of the consequences of that plea, in accordance with Supreme Court Rule 402. The defendant later tried to withdraw the plea, stating that he would not have pled guilty

had he known he could not change his mind. When asked about what led him to this mistaken belief, he answered, "My attorney."

This court ruled that whether to vacate a plea of guilty is within a trial court's sound discretion and that evidence of defendant's subjective impression of his attorney's advice, standing alone, is not enough to require the withdrawal of a guilty plea. Since there was no objective proof to show he was reasonably justified in his alleged mistake, there was no abuse of discretion. *Hale*, 82 Ill. 2d at 176.

*Hale* is indistinguishable from the instant case. Defendant was fully informed of the consequences of his plea, and Rule 402's requirements were completely satisfied. Defendant can show nothing more than his own allegation of a mistaken subjective impression.

Defendant's final proffered reason that his guilty plea should have been withdrawn is that he was not adequately aware of the consequences of his plea. In particular, he claims that he was unaware that by entering into it, he was admitting his eligibility for death. If this were true, the guilty plea would be properly withdrawn under *Morreale*.

However, the record belies defendant's contention. The record establishes that defendant was warned of the possibility of the death sentence no less than eight times in open court.

At the hearing where he first offered his guilty plea, the trial judge asked him:

> "Do you understand, sir, that the possibility exists that in the event I were to accept pleas of guilty to these charges that conceivably you could be sentenced to death?
>
> THE DEFENDANT: I understand that.

THE COURT: And knowing and understanding that, it is still your desire to offer open pleas of guilty to these three—these four charges, is that correct?

THE DEFENDANT: Yes."

The judge then entered a continuance of the proceedings so that defendant would have time to think about the consequences of his plea. When the proceedings recommenced, again to confirm that defendant understood the nature of his actions, the court admonished defendant that, "[i]n the event you were to plead guilty or be found guilty of this offense, you would be guilty of first degree murder for which you could be punished by an imposition of penalty of death."

After hearing the warnings of the consequences of pleading guilty, the defendant signed a jury waiver and a plea of guilty. Before the trial court accepted it, it asked defendant, "Do you understand that as a result of [the] sentencing hearing [that would follow his plea of guilty] it is possible that you could be sentenced to death?" Defendant answered "yes." The State then offered a statement of a full factual basis, but the defendant denied its accuracy. The pleas were therefore rejected, and a trial date was set.

Before the trial date, defendant requested a chance to be heard in court. At that time, he indicated that he again wished to plead guilty. The trial court warned him of the death penalty in the same manner as before, and defendant decided he wanted a bench trial. The same trial date that had been set the last time he had tried to plead guilty was kept.

That trial did not occur because defendant again indicated his desire to plead guilty. Again, his awareness of the consequences of his plea was tested by the judge in the same manner as in the first two proceedings.

The defendant then signed a jury waiver and plea of guilty, which included the warning "[t]he Defendant is

first admonished by the Court that the punishment for [first degree murder] is [t]he imposition of the death penalty [or terms of imprisonment]." After the State provided a factual basis for the pleas, the judge accepted them.

The defendant then waived his right to have a jury determine his sentence. The judge admonished him at length of his right to a jury for sentencing, and that all 12 jurors would have to agree on the death sentence before it could be imposed. When defendant persisted, the judge accepted his waiver.

The record demonstrates that Judge Eberspacher was very diligent in his efforts to make sure defendant knew the consequences of pleading guilty. Defendant's claim that he was unaware of the possibility of the death sentence is totally without merit.

Moreover, there is no question as to defendant's guilt; he was caught in the act of molesting the girls minutes after the murder. The ends of justice will not be better served by submitting this case to the jury. If given a trial, this defendant would assuredly be found guilty. Thus, there are no *Morreale* justifications in this case, and the trial court did not abuse its discretion when it refused to withdraw defendant's plea.

### SATISFACTION OF THE DEATH PENALTY REQUIREMENTS

Defendant makes two arguments concerning the eligibility phase of the death penalty hearings. First, the court erred in finding that the murder was committed in the course of an aggravated criminal sexual assault. Second, the court erred in finding that the murder was exceptionally brutal or heinous behavior indicative of wanton cruelty.

Defendant's claim that the murder was not committed in the course of an aggravated criminal sexual as-

sault is based on his interpretation that the aggravating factor requires the murder to follow the underlying felony. He argues that the assaults occurred after the murder and therefore they could not have occurred "in the course of" the murder, as contemplated by section 9—1(b) of the Criminal Code (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)).

Defendant's argument fails for two reasons. First, it is not adequately grounded in fact. Defendant began his sexual assault before the murder when he ordered the girls to disrobe in the bathroom. He then used his actions as a threat to the girls if they did not cooperate. Second, his contention that the murder must follow the felony has no legal basis. It is well established that the language "in the course of" another felony does not necessarily mean "following" the other felony. See *People v. Flores* (1989), 128 Ill. 2d 66, 96-97; *People v. Foster* (1987), 119 Ill. 2d 69, 94-95; *People v. Ramirez* (1983), 98 Ill. 2d 439, 458-59.

Defendant also argues that the trial court erred when it found that the murder was exceptionally brutal or heinous and indicative of wanton cruelty, an aggravating factor making a defendant eligible for death under section 9—1(b)(7) of the Criminal Code (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(7)).

There was evidence at the sentencing stage that the victim was unconscious 5 to 10 seconds after he was stabbed, and that he probably died within half a minute after the stabbings. The State agrees that the victim died quickly. Defendant argues that, in light of *People v. Lucas* (1989), 132 Ill. 2d 399, the victim's quick death precludes a finding of brutal or heinous behavior.

In *Lucas*, defendant was convicted of murder after he, in a drunken stupor, shook his seven-month-old son, banged him against his crib, and suffocated him. The boy suffocated almost immediately after the injuries were in-

flicted, and the injuries themselves could have resulted from a single blow. The court concluded that there was not enough evidence to establish that the death was premeditated, prolonged, or torturous, and therefore the State could not show that the circumstances surrounding the death were exceptionally brutal or heinous. Since this was the sole aggravating factor, this court vacated the death sentence. *Lucas*, 132 Ill. 2d at 446.

*Lucas* is distinguishable from the instant case. *Lucas* does not stand for the proposition that any wound quickly inflicted is never brutal or heinous, or that a quick death can never be the result of brutal or heinous behavior. Rather, the court ruled that the particular facts of that case required such a finding. Pertinent to the case at bar was the finding in *Lucas* that there was no evidence of premeditation. (*Lucas*, 132 Ill. 2d at 446.) Here, on the other hand, defendant took three knives from his home, walked two blocks to the victim's house, broke in, woke up and chased his victim before he stabbed him to death. The victim was nearly decapitated. The trial court specifically found that the murder was premeditated, calculated, and in cold blood. There was ample support for this finding; hence, the conclusion that the murder was extremely brutal or heinous and indicative of wanton cruelty was not inconsistent with *Lucas*.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied his sixth amendment right to effective assistance of counsel. Defendant argues that defense counsel's tactic of introducing two psychiatric reports at the sentencing hearing rendered the representation deficient as a matter of law, because the reports had no mitigating value and included prejudicial information.

At the sentencing stage, defense counsel argued in mitigation that defendant had suffered a disadvantaged

situation in life, that he had no significant history of prior criminal activity, that at the time of the murder he suffered extreme mental or emotional disturbance, and that the murder was not premeditated. To bolster these arguments, defense counsel offered the reports of two psychiatrists who conducted evaluations of the defendant after his arrest.

Ineffective assistance of counsel is established by a showing that: (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance so prejudiced the defense as to deny the defendant a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.

It cannot be said that offering the reports fell below any objective standard of reasonableness for attorneys. Defense counsel relied extensively on the reports during his closing argument of the sentencing phase. The reports were the only evidence entered to support the final three mitigating factors; had defense counsel chosen not to use them, the only mitigating factor available would have been the disadvantaged environment in which defendant grew up. The reports were also the strongest evidence of this disadvantaged environment factor.

It is true that the reports had some damaging information about defendant, along with the mitigating information. Of course, defense counsel could not bifurcate the reports. Thus, he had the choice of introducing the mitigating evidence crippled to some extent by unfavorable information, or introducing almost no mitigating evidence whatsoever. Defense counsel chose to offer the evidence. The fact that his chosen approach was not persuasive does not render the attorney's services constitutionally deficient. Since defense counsel's actions were

reasonable, defendant fails the first prong of the *Strickland* test, and his argument of ineffective assistance of counsel must likewise fail.

Defendant also argues that the tactic deprived him of his constitutional right to effective psychiatric help, relying on *Ake v. Oklahoma* (1985), 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087. His reliance is misplaced. *Ake* simply states that if a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor, due process requires that the State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one. *Ake*, 470 U.S. at 74, 84 L. Ed. 2d at 60, 105 S. Ct. at 1091-92.

*Ake* is inapplicable to the instant case. Here, the defendant's sanity was never in issue. The State did not order psychiatric care to bolster its case, nor did defendant raise the defense of insanity. Further, defendant's access to psychiatric care is undisputed, as he had two examinations.

## THE HOME INVASION CHARGE

'Defendant argues that the home invasion charge must be vacated because it was the basis for the murder charge. He then goes on to argue that, since it was the basis for the murder charge, using the home invasion as an aggravating factor to establish eligibility for the death sentence constituted an unconstitutional double enhancement. Consequently, the death sentence must be vacated.

Whether the home invasion charge itself must be vacated is resolved by this court's recent decision in *People v. Scott* (1992), 148 Ill. 2d 479. There, the defendant was a man who strangled a woman to death. While strangling her, he bit her nipple and vagina. He was found guilty of murder and attempted robbery, and guilty but

mentally ill of aggravated criminal sexual assault. He was sentenced to death, as the murder was committed in the course of committing the aggravated criminal sexual assault.

Defendant argued, *inter alia*, that the death penalty was the result of an impermissible double enhancement, because the strangulation was used as the basis for the murder charge and also the aggravating factor which enhanced the offense of criminal sexual assault to aggravated criminal sexual assault, which was then used to establish his eligibility for death.

This court rejected his argument, since the bitings alone could have sustained the aggravated criminal sexual assault charge. "Because defendant's conviction for aggravated criminal sexual assault could be supported without relying on the acts which caused the victim's death, there is no impermissible double enhancement." *Scott*, 148 Ill. 2d at 562.

Here, on the other hand, the home invasion conviction cannot be supported without relying on the acts which caused the victim's death. In the count charging defendant with home invasion, the State alleged that defendant, "not a police officer acting in the line of duty, knowingly and without authority, entered the dwelling of Donald Buske, having reason to know Donald Buske to be present within that dwelling and intentionally caused injury to Donald Buske in that he stabbed Donald Buske with a knife."

Home invasion is the act of entering a home and injuring a person or using force or threat of force against a person. (Ill. Rev. Stat. 1989, ch. 38, par. 12–11.) Although the sexual assaults could have been the underlying injury for the home invasion, this is not an allegation in the information to which defendant pleaded guilty. Rather, the underlying injury specified in the information is the stabbing.

The acts that supported the conviction of the felony murder were. the breaking into the home, the waking, the chasing, and ultimately, the stabbing. The home invasion charge is necessarily a lesser included offense of the murder. We therefore vacate the home invasion charge and its sentence of 60 years' imprisonment.

Defendant also argues that the trial court impermissibly used the home invasion as an aggravating factor to support the imposition of the death sentence. However, this has no basis in fact, since the trial court did not use the home invasion as an aggravating factor. At the sentencing stage, the judge said:

> "I believe the evidence in this case, as well as the defendant's guilty plea to [the counts charging aggravated criminal sexual assault], are sufficient to support a finding of felony murder for purposes of eligibility for imposition of the death penalty without regard to whether or not the plea to home invasion can be considered as an aggravating factor."

Since the home invasion was not used as an aggravating factor, we need not address whether to do so would have been proper.

## DEFENDANT'S CONSTITUTIONAL CLAIMS

Defendant makes several constitutional claims, all of which are without merit and which may disposed of summarily.

Defendant's first constitutional argument is that the term "brutal or heinous" in section 9—1(b)(7) is unconstitutionally vague, in violation of the eighth and fourteenth amendments. We addressed the same challenge and rejected it in *People v. Odle* (1988), 128 Ill. 2d 111, 138-41. We reaffirm that decision today.

Likewise, we reject defendant's argument that the term "cold, calculated and premeditated" in section 9—1(b)(10) is unconstitutionally vague. We disagree. The

challenged terms provide adequate guidance for assessing death eligibility, and the facts of this case provide ample support for the judge's finding that the murder was cold, calculated and premeditated.

Defendant next claims that the trial court did not provide the individualized consideration of mitigation required by the eighth and fourteenth amendments because it determined that defendant's background was not mitigating. Apparently, defendant believes that evidence of a disadvantaged background is inherently mitigating, and sufficiently so. This is not the law, and we decline defendant's invitation to broaden the term "mitigation" to that extreme. The sentencing judge considered the defendant's background, and concluded that it did not militate against imposition of the death penalty.

Defendant next contends that the death penalty statute is unconstitutional because its burden of proof effectively precludes consideration of mitigating factors. This court has considered and rejected this contention a number of times. (See *People v. Morgan* (1991), 142 Ill. 2d 410, 472; *People v. Bean* (1990), 137 Ill. 2d 65, 138.) We reaffirm those decisions today.

Finally, defendant argues that the death penalty is unconstitutional because it does not sufficiently guard against the possibility of an arbitrarily or capriciously imposed sentence. Again, this court has upheld the statute in the face of previous challenges that the statute results in arbitrarily or capriciously imposed death sentences. (See *People v. Gosier* (1991), 145 Ill. 2d 127, 165; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.) The death penalty statute sufficiently guards against these evils, and defendant's argument must be rejected.

## CONCLUSION

For the reasons we have stated, the judgment of the circuit court of Montgomery County is affirmed in all as-

pects except the home invasion conviction, which is vacated. The corresponding sentence of 60 years' imprisonment is also vacated. The clerk of this court is directed to enter an order setting Tuesday, May 11, 1993, as the date on which the sentence of death entered by the circuit court is to be executed. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be delivered by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Convictions affirmed in part
and vacated in part;
death sentence affirmed.*

JUSTICES McMORROW and NICKELS took no part in the consideration or decision of this case.